Good morning. My name is Robert Rubin and I represent the appellants. And may I reserve two minutes for rebuttal. Thank you. This case involves an inventory method of accounting and the recurring item exception to the economic performance test. The taxpayers have used the same method of accounting since the inception of their business in the 80s. They were audited and at the IRS Independent Office of Appeals, they approved the method of accounting. And that's prior audit evidence that the tax court excluded. It should have been admitted, especially considering the IRS approval of this method of accounting at IRS Appeals. And the cases discussing the relevancy of that evidence are in our briefs. Can you answer one question I've always had? Why does it matter? Why does it matter whether or not the reconditioning costs are applied in year A or year B? It seems like at the end of the day, you're going to pay the same amount. Well, by deducting them in year A, you reduce taxable income in year A. And yes, over the entire The adjustments in the first year here, 2008, result in about a $5 million tax liability for the taxpayers. Got it. So the recurring item exception to the economic performance... I'm sorry, can I just follow up on that? So, sorry, is that just because of the slice of time that the IRS chose to go back to? I mean, I don't really understand why over time, if you just kept doing this, it would change the amount owed. Well, over time, it wouldn't. But in 2008, there were huge adjustments to cost of goods sold, which increased taxable income, which increased the tax liability of the partners. And it's just that... But like, if they had started the year before that, it would have been accounted the year before that, right? Like, I don't understand. It's because of the particular years chosen that this happened, right? Well, it's because of the size of the taxpayer. We're talking about $20 million adjustment to cost of goods sold, moving it from year one to year two, that results in a tremendous amount of increased income in year one. And it's because of the size of the taxpayer, the dollars involved. But the bottom line is, under either method of accounting, you're going to pay the same amount long-term. It's just what's owed immediately.  Okay. Correct. So, and my understanding was always that the taxpayer has some deference on which way to make the accounting as long as the method clearly reflects income. Well, that is correct. And it's especially true for inventory accounting. The regulations say that it's based on the experience and custom in the industry, and also that consistency is the greatest greater factor, is what the regs say. So, consistency goes to whether the method of accounting reflects income. But I thought that was a different issue than whether the method results in a more proper match against income. I know those sound really similar, but aren't those different concepts? Well, yes, because in the recurring item exception, in order to use it, there's got to be the method used by the taxpayer must result in a more clear match of income and expenses. And so, we've got these tomato processing facilities that run flat out for 100 days in the summer, basically. And they're inoperable. That's stipulated. They're inoperable when the plants shut down. And all this $20 million of work needs to be done. I have a question about that, counsel. The security agreements have an exception for ordinary wear and tear. And contextually, even though the machinery is in lousy shape at the end of the season because it's used 24-7, everybody knew that at the outset. And given this context, why isn't that ordinary wear and tear as opposed to, say, a part that breaks or a fire destroys something or something like that? Why isn't that in this situation, ordinary wear and tear, looking at New York law, which, weirdly, these contracts tell us to apply? So, ordinary wear and tear means that the plant is still operable. Why is that true? It is whatever results from the use that the parties expect. But no one could step in and operate the plants after they were shut down. I don't really understand that, though. Because, I mean, are you saying that at the end of the summer, if one more truck of tomatoes arrived, you couldn't process it? That's correct. How is that possible? Well, first of all, if you shut the plants down, you would lose sterility. Right, I understand that. But doesn't that go to you have to sterilize before the next season? It doesn't really mean they're inoperable in September or whatever the time is. It's stipulated that they're inoperable. There's a stipulation that unless this work is done... But for the next season, not if one more truck arrives in September, right? It would be uneconomic to re-sterilize the plant for one more truck of tomatoes. That's not the question. The question, I think, if I understand it correctly, is does the machinery become inoperable because you turn it off and stop producing? Or does it become inoperable because you've reached the last possible tomato and the machine says, I give up? It's inoperable because it's been run flat out for 100 days. You've got these big boilers. That doesn't answer my question. Is it physically inoperable or is it inoperable because you turn it off and then have to go through a lot of tremendous work to get it restarted for the next time? If the question is, could they have processed another truckload of tomatoes had they not shut it down? Yes, they could have. Okay. And so doesn't that show that really the repair is to do the next season? I mean, it is to do the next seasons of work, right? You need to sterilize it so that you can start the next season's tomatoes. Well, yes, but you also need to do the work to repair the damage that was done during the current year. And the legislative history of the recurring item exception talks about matching expenses with income. It talks about a sale is made in year one, but the commission isn't paid until year two or the shipping costs aren't paid until year two. Under the recurring item exception, you should match those expenses with the sale revenue recognized in year one. And our method allocates. We're not taking all the repair costs in year one. We take that percentage of the repair costs that is equal to the current year's production that was sold in year one. It's really a perfect match of income and expenses. So you have this argument that it would be in violation of the loan agreements if you didn't do these repairs. And so this is partly why there's this obligation. But you don't actually do the repairs until the next spring. So are you in breach of the loan agreement all the way from fall to spring? Well, you're certainly in breach of it if you don't do the work in the spring. But, okay, but so are you in breach of it in January? It's debatable. I guess because it seems like your argument suggests you're in breach of the agreement most of the time, I have trouble telling why it helps you show that the expense goes in the fall versus the spring. I mean, if you're just in breach a lot of the time, then how does it tell us where you should put the money? It's not that it's in breach of the agreement the day after you shut down. But it's the loan agreements that create the absolute liability that that work has to be done. The loan agreements don't say when it has to be done, but it does have to be done. And that's the absolute liability. So partly this gets back to Judge Graber's question, though. So the loan agreements allow you to have normal wear and tear. And everyone knows, I think, that over the course of use, there's going to be this need for further work. But part of the work is sterilization, too, right? If the lender had to repossess this equipment and move it somewhere, it would not be sterile anymore, would it? No, but the lender—let's say there was a default on the loans. They weren't being paid. The lender would require this work to be done by the borrower before— I mean, it wouldn't make sense to make them sterilize it if they had to move it somewhere else and then be sterilized again, right? That's correct. So a lot of this work wouldn't have to be done under the loan agreement? Well, the sterilization isn't that much of the work that needs to be done. Do we have a breakdown of that? Yes. It's—excerpt of records. It starts on 428, goes through 430, and there's a very detailed description of the work that's done, including labor, boiler fuel, electricity, waste disposal, chemicals, lubrication, production supplies, repairs and maintenance. All of this, by the way, was stipulated by IRS. So they wouldn't have stipulated that $70 million of work had been done if the taxpayer had not substantiated the work that was done to— I think everyone agrees the work is done. The question is just when is it best matched to income, and when—if is there this obligation under the loan agreement or not? Well, they produce tomatoes. It's done in October. Fifty percent of them are sold before the end of the year under the taxpayer's method of accounting, which they've consistently used, was approved by IRS. They allocate 50 percent— Do you know why they changed—the IRS changed its position on this? No. Has they—have they done it across the board, among other—you probably might be in a unique industry. I don't know if they've done this across other tomato pasters. I'm not aware of that, but I can tell you that, as far as I know, this is a unique situation because most tomato processors are C-corporations and can elect a June 30 fiscal or taxable year because these are taxes partnerships that can't. That's what causes the problem here. Can I ask a follow-up to Judge Freeland's question about if, in January, the loan said that you're in default, isn't the answer is, yes, you're in default, but then, you know, you have time to cure it at that point, and the practice among the parties in this particular case is not to call for a default in January. It'd be closer to June, or that's—April, I think, is when— It's not in the record, but there's never been a default declared by the lenders. But this work has been done every year. It's just a party practice, right? Yes. You want to save your time for rebuttals? Please. Thank you. Good morning. May it please the Court, I'm Anthony Sheehan, and I represent the Commissioner of Internal Revenue. The Court started out today talking about timing, and timing does matter. You see the big adjustments here. You see that many investors will try to coordinate the sale of gaining and losing securities, and a lot of the early 80s tax shelters were based on timing. But is there any reason to think that's happening here? I mean, I thought it was clear that they had been doing the same thing all the time, and if they're doing the same thing all the time, the income is coming sometime. You're going to get the taxes sometime. I don't understand why all of a sudden you're pursuing this case, or why you're starting in the year where you're starting. We were pursuing this case because the IRS conducted an audit and decided that this method— first of all, that this taxpayer did not meet the all-events test, and that's the first test that must be met. Under this Court's all-challenge publication, you've got to meet the all-events test, and then secondarily, that this was not a good match, and the Commissioner has broad discretion to determine that the match being used, the method of accounting being used—and matching is part of method of accounting—to determine whether it would clearly reflect income. But wasn't there another audit previously, and this was blessed? There was another audit previously, but to say it was blessed, I think, is a great exaggeration. Those audits ended in no-change letters. The no-change letters means— So did the IRS know about this method of accounting in the first audit? Well, the first audit was of—one of the audits was of Morningstar, and all we have in the record is a no-change letter. The second audit was of a company that— Presumably, the IRS did a good job in auditing the first time, and they would have known how they made their accounting, correct? Presumably, they did do a good job in auditing, but each time— And then that led to no change, so presume—I mean, a good inference is that they blessed it. Well, a no-change letter simply means that they didn't disallow it, but— Which means they blessed it. Well, but it does not make any promises. It does not make any commitments. It does not make any assurances. But there's a stopper, correct? Like, there's reliance interest that, you know, for 20 years, they've been doing it the same way. You've been blessed once. That's why it's just kind of surprising, all of a sudden, out of the blue, the IRS is saying, no, you can't do this. Well, the all-events test is a legal test, and— Did it change over the last audit? The all-events test has been constant, but it's a legal test, and the commissioner cannot be stopped on a legal test, nor can the commissioner be stopped— No, but was there a change in the all-events test before—between this audit and the No, the all-events test has been pretty consistent. So, the question I have is, if the IRS made a legal error in its earlier audit, is it bound to continue that ad infinitum? No, it is not. And in terms of audits, things change over time. You've got difference in enforcement priorities, difference in resources, an item which may be a small item on a return one year may grow to be a big item, and a future auditor may look at it and decide, we need to fix this. If a taxpayer— I just really have trouble—I mean, I think you may have really good legal arguments on all the points, but I'm just really struggling with why you've bothered to do this case, because you may have good arguments that the 2008 money should have been paid in 2007, but they're going to pay it in 2009 or 2008. I mean, it's going to get paid. No one is saying they're not paying or doing this work. So, I just really don't understand why this is a priority or what's going on here. The IRS audited this, and the case went forward. We don't look— It seems to me financially, it could make a difference at the end, because if they're not actually required by contract to perform the next spring's repair and cleanup, whatever we want to call that, and they simply stop, I'm not sure it does come out the same way. Well, that's really two things I was actually going to get to, Your Honor. One of which is that if a taxpayer is consistently doing it wrong, you could say that, well, at the end of time, it'll all even out. But oftentimes, as we saw with a lot of the early 80s shelters, that last year, that last balloon of tax liability doesn't get reported. Or if it does get reported, the taxpayer says, well, I don't have the money anymore. I can't pay it. So, it basically is taking an interest-free loan from the government and hoping and putting the risk on the government that at the end of time, the money will be there. Hey, interest-free loan? It's their money that they're giving to you. I just don't understand that. If you're doing improper matching and shifting your tax liability forward, forward, that means that each year you're paying less taxes. That's just a philosophical difference, I think we have. Yes, Your Honor. And secondly, if a taxpayer does want clarity and does want assurance, the IRS has programs for that. Yeah, but isn't going through an audit and being given no change kind of assurity and all the insurance you need? No, no, it is not. It just means for that year. Isn't it also true that IRS has blessed this for other tomato processors as well? In the record, the other audit was of a related company that's now defunct. It did go up to appeals, but it still resulted in a no-change letter, a letter just saying, for these years, we are not changing anything on your return. So, it just really seems like you're singling them out for some reason. Well, right now, we have to decide what's the correct result, in this case, on these facts before us. I mean, all audits involve a selection process. And we don't, and it's a standard thing in the tax court, we don't look behind the notice of deficiency, we don't look behind the FPAW. We decide what is the correct application of the tax law to this item on these facts. Do you have, what is the precise effect of a no-change letter, the legal effect of that? The legal effect is that for this particular tax year under audit, we have not changed your return. But you're not penalizing them in any way, correct? No, there are no, that's right. For some adjustments that were conceded, I think there is a penalty, but that's off the table now. For these adjustments, there is no penalty. It is just simply the adjustments. It just seems like a difference in accounting. Just a difference in accounting for these particular adjustments. Am I wrong? I thought usually we give deference to the taxpayer on how to adjust, as long as their accounting method clearly reflects income. Well, the deference would be, really, in the question you asked, Your Honor, it has to clearly reflect income. If it doesn't clearly reflect income, if you look at the cases which my opponent cited in his brief, you had one involving fees and storage for liquor barrels. There was a battle of the experts, and it was determined it clearly reflected income. In the New Hampshire public utilities case, the taxpayer was using a method that was industry standard and had been accepted by the IRS. The IRS has broad discretion to change a method of accounting that does not clearly reflect income, but if it does already clearly reflect income, we don't get into debates about what reflects income even more. In this case, we know income is going to be reflected. It's just a matter of either A or B, correct? Right, and if you look at the stipulation of facts... So it just seems like, I don't know, it's just kind of subjective, and you're just saying mine is better and yours is not. Well, again, if you look at the stipulation of facts, page 1241, the costs at issue are costs to restore, rebuild, and retest the manufacturing facilities for use during the next production cycle. If the companies were to shut down, they would not be reconditioning these. Every supply contract has a clause in it for a short crop. In other words, if something happens with the tomatoes, and let's say there's only going to have half a crop this year, Morningstar and Liberty can invoke that clause to reduce the amount of paste they have to supply. And they've got three production lines. If they figure out they can process those tomatoes with two, the question then becomes, are they going to spend millions of dollars, and they've emphasized how expensive this is, to recondition all three production lines when they can get by with two. So long as the customers get the tomato paste commensurate with the tomatoes available, they're not going to ask for the third one. And it seems to be odd that the bank, who wants to protect its collateral and get repaid, would say to them, well, sorry, but even though you're not going to use that line this year, please go ahead and spend millions of dollars you may not have to recondition it. I want to ask you one more question just to be sure I understand your position. Your difference of view on the accounting system, it sounds like your argument isn't this is just a difference of view. Your argument, as I understand it, is that under the legal standard that applies on the All-Events Test, they are not entitled as a matter of law to what they've done. Is that correct? That is correct. And that's what the tax court said and stopped. Matching is a separate question. The tax court went ahead and looked at the evidence and said, taxpayer has not shown that the All-Events Test was met, so that this liability is fixed in year A, in the first year. Do you agree that the reconditioning cost is ordinary wear and tear? Under New York law, which is what applies here. If I understand correctly, well, certainly processing tomatoes all out for several months imposes wear and tear on this equipment.  But I'm asking you the $20 million in reconditioning fees. That's not wear and tear, is it? I'm trying to make sure I understand your question correctly. I'm surprised you're hesitating, because I thought this was definitely your position. I thought your position was that it was wear and tear, and that's why it's not a breach of the contract. Isn't that what you argued? Yes, you're right. It is wear and tear. How can that be? $20 million is wear and tear? Well, let's put it this way. The question is, what does the bank want? What does the bank want for this equipment? The equipment includes things like pumps. Wear and tear would mean they recondition it all the time, and things get loose, things get old. That's wear and tear. But if they did not recondition it at all, that's much more than wear and tear. That's destruction of the equipment. You would agree? Well, after the processing ends in year A, yes, they do have to do cleaning. They've got to clean out the residue. They've got to prepare this equipment for the hiatus. And if they didn't? That's all allowed in year A. What happens to the equipment if they continue to use the processing for five years without reconditioning? If they continued continuously for five years, I don't think the equipment could handle it, but they have to. And so that's breaking the equipment. That's not ordinary wear and tear, correct? Five years straight, flat out, no breaks. That's probably abuse of the equipment. Yeah, exactly. Right, but the reconditioning... So therefore, reconditioning is a necessary part of using the machine, so that's not wear and tear. The reconditioning is necessary so that you can do the processing in year B. That's why it is a forward-looking thing into year B. And so the question... Well, why is that the case? Because in year zero, right, the equipment comes in brand new, right? And then they process tomatoes. At the end of year A, processing the tomato, why wouldn't it be proper to restore it back to the proper working condition at the end of year A? They do have to restore it if they want to process it, but they're restoring it so they can process. If they ended year A and decided, this tomato thing's not going to work out, they're not going to recondition it. And the question... Sure, but under Gold Coast, we don't really consider those random contingencies. Well, the question is, at what point... They're going to spend 20... How many millions of dollars on this equipment? They're going to stop it after one year and just say, eh. Well, if it didn't work, fortunately for them... It's unrealistic. Under Gold Coast, don't we say we look at what's actually reasonable and, you know, reasonably foreseeable? And the fact that they're just going to stop processing tomatoes after spending all this money is pretty unreasonable. Well, in Gold Coast, the point there is that at 1,200 slop club points, this liability is fixed. You know you're going to have to pay the reward. The technicality of somebody claiming it... Right, and then we said that even if, like, the casino shut down, if there was a fire that caused the casino to shut down, we said even under these random contingencies that that cost is already fixed. Yes, but here their argument is that in October of year A, because of the bank financing and supply agreements, it is absolutely fixed. We are going to have to go in in June, no matter what, no matter if a blight wakes up all the tomatoes. We're going to have to go in there and recondition this equipment to the point where we can process tomatoes again, spend millions of dollars, even if it's going to continue to live fallow. Our point is that you don't... That does not happen in year A. The very fact of the practice of it, that the equipment is not reconditioned until year B, and then it's reconditioned in anticipation of the next production cycle is where you get that fixed liability, when they decide, yes, indeed, the harvest is looking good. Heck, the farmers aren't even buying tomato seeds until December. The harvest is looking good. The tomatoes are going to come in. We need all three lines. We need to get them ready and put them in shape to process these new tomatoes coming in. That, as the tax court once described in the case, is the heart of the transaction. That is the thing that that decision is what fixes the liability. And, you know, looking at the banks, the banks, they've yet to establish the banks are saying, we want fully reconditioned equipment as opposed to we want things we can sell for collateral. And I see my time's up. So unless there are any further questions, I thank the court for its time and ask you to affirm. Thank you. We have some time for rebuttal. So, Judge Graber, the question about the last year, there's a safety valve in the recurring item exception. If these funds aren't expended within eight and a half months of the end of the taxable year, they cannot be accrued. So that's the safety valve that actually overrules Gold Coast. The recurring item exception was effective for taxpayers beginning after 1231-91. Gold Coast was before that. If the slot points weren't redeemed within eight and a half months of the end of the taxable year, they're not going to be deductible. So there's a big safety valve in the recurring item exception. So appeals does not issue no change letters, right? Examination raised this issue, disallowed the accrual. The taxpayer filed a protest, went to appeals. We've got a letter from an appeals officer saying, I don't think you're entitled to accrue that. But ultimately, and what happened, the appeals officer talked to the supervisor and they conceded the issue. But there's no law that says that binds the IRS. Oh, no, no, no. There's no estoppel. We never argued there was a estoppel. We're just saying it's a factor that should be considered. But none of that goes to the all events test, right? You have to pass the all events test first.  The match, the government's position, there's no match. It all gets allocated to the next year. The taxpayer's method is actually a very technically elegant method of allocating these expenses between current year sales and next year sales. And in the all events test, there's an absolute liability in these contracts to do that work. If that work isn't done and it impairs the lenders, for sure they're going to enforce that. And that's the absolute liability. The eight and a half month rule and the recurring item exception is the government safety valve. If the work isn't done, then you can't accrue anything. You're out of time, so if you could wrap up, that'd be great. All right. Thank you very much. Thank you both sides for the helpful arguments. This case is submitted.
judges: GRABER, FRIEDLAND, BUMATAY